# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     **Criminal Action No. 2018-0008** |
| | ) |
| KIEANTIA THOMAS-OKEKE, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Melanie L. Turnbull, Esq.,**
St. Thomas, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Kieantia Thomas-Okeke's ("Defendant") "Motion to Suppress Statements and Evidence" ("Motion to Suppress" or "Motion") (Dkt. No. 17); the Government's Opposition and Amended Opposition to Defendant's Motion (Dkt. Nos. 22, 58); and the supplemental briefing submitted by the parties following the suppression hearing held on February 19, 2019 (Dkt. Nos. 67, 70). For the reasons that follow, the Court will deny Defendant's Motion to Suppress.

## I.     BACKGROUND[1]

Defendant is charged in a two-count Information with conspiracy to possess and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial

846. (Dkt. No. 11).[2] Customs and Border Protection ("CBP") Officer Patrick King, CBP Officer Gisselle Lopez, and Homeland Security Investigations ("HSI") Special Agent Kelly Holmes testified at the February 19, 2019 suppression hearing. The following facts emerged from the record established at the hearing.

At approximately 9:30 p.m. on March 5, 2018, CBP officers executed Operation Gun Dog at the Henry E. Rohlsen airport on St. Croix as an American Airlines flight arrived from Miami, Florida.[3] As part of the operation, Officer King used CBP canine officer "Cougar"—who is trained to detect the odors of controlled substances and concealed human beings—to perform sniffs of passengers arriving on the American Airlines flight as they walked through a corridor towards the airport's baggage claim area. Officer Lopez was also present to assist Officer King. Cougar "passively indicated" on Defendant as she walked through the corridor with her carry-on luggage.[4]

Following Cougar's passive indication, Officer King instructed Defendant to accompany Officer Lopez to a nearby table maintained by CBP in a public area of the airport for purposes of searching passengers' bags. Defendant followed Officer Lopez to the table and placed three pieces of carry-on luggage on the table—a small purse, a backpack, and a carry-on suitcase. Officer Lopez then asked Defendant three question to obtain what Officer Lopez referred to as an "oral binding

---

[2] motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[2] The operative Information in this case is an Amended Information filed on March 20, 2018 (Dkt. No. 14). The Government commenced this action by filing a Criminal Complaint on March 6, 2018 (Dkt. No. 1), followed by an Information on March 15, 2018 (Dkt. No. 11).

[3] As described by Officer Lopez, at the time the events described herein took place, Operation Gun Dog was a routine operation conducted by CBP officers approximately once or twice per week for purposes of intercepting firearms and other prohibited contraband as they arrived on St. Croix.

[4] Office King described Cougar's passive indication as a change in posture and respiration.

declaration." First, Officer Lopez asked: "Are these your bags?" Defendant replied affirmatively. Second, Officer Lopez asked whether Defendant had packed the bags herself. Defendant stated that she had, with the exception of the carry-on suitcase, which her cousin had packed. Third, Officer Lopez asked whether there was anything in the bags that could puncture or cut Officer Lopez. Defendant stated that there was not.

Officer Lopez put on gloves and proceeded to search Defendant's luggage. She searched the small purse and the backpack first, and did not discover any contraband. Upon unzipping the carry-on suitcase, Officer Lopez observed various packages wrapped in plastic, some smaller and some larger. Although she could not see the contents of the packages, Officer Lopez testified that the packaging was consistent with packaging used in the smuggling of cocaine.

After Officer Lopez discovered the packages in Defendant's carry-on suitcase, she placed Defendant in handcuffs. Officer Lopez alerted two other CBP officers, and together the CBP officers escorted Defendant to the secondary inspection area in the airport.[5] Upon arrival in the secondary inspection area, the CBP officers asked Defendant to sit down in a chair and removed the handcuffs from Defendant's wrists. Officer Lopez testified that there was "basically no conversation" between Defendant and the CBP officers in the secondary inspection area. The CBP officers alerted their supervisor that suspected contraband had been discovered, and the supervisor in turn contacted HSI Special Agent Holmes.

While in the secondary inspection area, CBP officers unwrapped some of the packages discovered in Defendant's carry-on suitcase. The officers discovered a green, leafy substance

---

[5] As described by Officer Lopez, the secondary inspection area is a room within the airport used by CBP officers when they perform more intrusive inspections of passengers or luggage. Although Officer Lopez could not recall the dimensions of the secondary inspection area, she stated that it contains three computers and a table used to perform inspections.

consistent with marijuana in some of the packages. The officers also discovered cash totaling $39,980. The CBP officers removed a small portion of the green, leafy substance discovered in one of the packages in order to perform a field test. The field test returned positive for the presence of marijuana.

Special Agent Holmes testified that she received a call on March 5, 2018 at approximately 9:30 p.m. alerting her that a passenger had been discovered in possession of marijuana and cash at the Henry E. Rohlsen airport. Special Agent Holmes traveled from her home to the airport, arriving at approximately 10:15 p.m. Upon her arrival at the airport, Special Agent Holmes met with HSI Special Agent Yusuf Adeen. After speaking with Officer Lopez and CBP Supervisor Horsford-Stevens, Special Agent Holmes entered the secondary inspection area to observe the evidence seized from Defendant, including the alleged marijuana and the cash. At that point, CBP officers were still counting the cash that was discovered in Defendant's luggage.

Special Agent Holmes further testified that—in addition to the alleged marijuana and cash—CBP officers seized Defendant's cell phone as part of the evidence in this case. At some point after Special Agent Holmes entered the secondary inspection area, but before she proceeded to interview Defendant as described below, Special Agent Holmes asked Defendant for consent to view the contents of the phone.[6] Defendant provided consent. (Dkt. No. 62 at 19-22). Although Special Agent Holmes could not recall whether she looked at the contents of Defendant's phone before or after she and Special Agent Adeen began interviewing Defendant, she testified that, at some point, she looked briefly at the contents of Defendant's cell phone, and reviewed Defendant's

---

[6] Special Agent Holmes could not recall the specific question she posed to Defendant in requesting consent to view the contents of her cell phone. She testified that she either (1) asked Defendant for the password for her phone, or (2) asked Defendant to open the cell phone for her. (Dkt. No. 62 at 20).

most recent text message exchange. *Id.* at 23-24, 28-29.[7] Special Agent Holmes stated that she was looking for anything "obvious," such as whether Defendant had arranged to meet anyone in connection with the alleged marijuana and cash. *Id.* at 24. She further testified that neither she nor any other law enforcement officer present during the events at the airport utilized any software to search Defendant's cell phone, but instead reviewed Defendant's cell phone manually. *Id.* at 26.[8] Defendant's cell phone was retained by law enforcement, and a warrantless forensic search of the cell phone was performed approximately one month later by a computer forensics specialist.[9]

From the secondary inspection area, Special Agents Holmes and Adeen brought Defendant into a room at the airport that Special Agent Holmes described as the CBP officers' cafeteria or lounge area in order to interview her. Defendant was not restrained as she was brought into the interview room. Before the interview began, Special Agents Holmes and Adeen took Defendant's fingerprints. After the fingerprinting, Defendant was permitted to wash her hands. The Special

---

[7] Initially, Special Agent Holmes testified that she could not recall whether she looked at the contents of Defendant's cell phone herself or whether another law enforcement officer looked at the contents of the cell phone. (Dkt. No. 62 at 22-23). She later stated that she had personally reviewed a text message on Defendant's cell phone. *Id.* at 24.

[8] Special Agent Holmes stated that at least one other law enforcement officer had Defendant's cell phone in his possession before Defendant was interviewed, but that she was not aware of what that officer may have reviewed on Defendant's cell phone. *Id.* at 22-23. She also testified that law enforcement officers continued to review the contents of Defendant's cell phone during the time that Special Agent Holmes and Special Agent Adeen were interviewing Defendant, as described below, and that the officers either informed Special Agent Holmes about information they had discovered during breaks in the interview, or showed Special Agent Holmes information on the phone. *Id.* at 25-26, 28-29. Special Agent Holmes testified that—although one law enforcement officer present during the events had been trained to conduct forensic searches of cell phones—no forensic search involving the extraction of information from Defendant's cell phone was performed at the airport. *Id.* at 29.

[9] Special Agent Holmes stated that law enforcement did not obtain a warrant prior to conducting the forensic search of Defendant's cell phone. (Dkt. No. 62 at 30).

Agents then asked Defendant some basic biographical questions, such as her name, date of birth, and occupation.

The Special Agents then set up a camera to record their interview with Defendant. Before the interview began, Special Agent Holmes asked Defendant if she wanted any water. Because she had become aware that Defendant was taking a prescribed medication, Special Agent Holmes also asked Defendant if she needed access to her medication.

After the camera began recording, Special Agent Holmes informed Defendant that she was going to read Defendant her *Miranda* rights. Special Agent Holmes read Defendant her *Miranda* rights, and then presented Defendant with a Department of Homeland Security ("DHS") Statement of Rights/*Miranda* Waiver form. Defendant signed the waiver portion of the form, which includes an acknowledgment that Defendant's rights had been explained to her; that Defendant fully understood those rights; and that Defendant was waiving her rights "freely and voluntarily, without threat or intimidation and without any promise of reward or immunity." (Evid. Hr'g Gov't Ex. 4).[10] Special Agents Holmes and Adeen proceeded to interview Defendant, and Defendant gave statements to the Special Agents.[11]

## II. DISCUSSION

In her Motion to Suppress, Defendant asserts that the searches of her luggage and cell phone by law enforcement officers violated her right to be free from unreasonable searches and seizures under the Fourth Amendment, and requests the suppression of all evidence discovered by

---

[10] A copy of the DHS Statement of Rights/*Miranda* Waiver form signed by Defendant and dated March 5, 2018 was introduced by the Government during the suppression hearing as Government Exhibit 4.

[11] A copy of the recorded interview was introduced by the Government during the suppression hearing as Government Exhibit 5.

law enforcement as a result of those searches. (Dkt. No. 17 at 1-3). Defendant also requests the suppression of the initial statements she gave to Officer Lopez based on her assertion that her statements were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). *Id.* at 3-4. She seeks the suppression of her later statements to Special Agents Holmes and Adeen on the grounds that (1) the statements were the fruit of Defendant's unlawful arrest; and (2) the statements were involuntary. *Id.* at 4-5.

In response, the Government concedes that the "border search exception" does not apply to the searches of passengers arriving in the Virgin Islands from the continental United States, such as the searches that occurred in this case. (Dkt. No. 70 at 1-2 (citing *United States v. Barconey*, 2019 WL 137579 (D.V.I. Jan. 8, 2019)). It contends, however, that law enforcement acted with a good faith belief that the searches performed here were lawful, such that the good faith exception to the exclusionary rule should apply. *Id.* Accordingly, the Government maintains that the evidence recovered as a result of the searches of Defendant's luggage and cell phone should not be suppressed. *Id.*

The Government also opposes Defendant's request for the suppression of her statements to Officer Lopez and to Special Agents Holmes and Adeen. With respect to Defendant's statements to Officer Lopez, the Government contends that Defendant was not in custody at the time the statements were made. (Dkt. No. 22 at 7-8). Alternatively, the Government asserts that CBP officers are permitted to ask routine customs questions at the border without providing *Miranda* warnings. Given its contention that the good faith exception to the exclusionary rule should apply in this case, the Government asserts that the statements Defendant gave in response to Officer Lopez's routine customs questions should not be suppressed even if she was in custody at the time they were made. *Id.* at 8-9. The Government further argues that Defendant's subsequent statements

to Special Agents Holmes and Adeen should not be suppressed because Defendant made the statements voluntarily after waiving her *Miranda* rights. *Id.* at 2.

A.      **Search of Defendant's Luggage and Cell Phone**

The parties agree that the Court's recent decision in *United States v. Barconey*, 2019 WL 137579 (D.V.I. Jan. 8, 2019), sets the legal framework for the analysis of the facts of this case.

In *Barconey*, the Court considered whether the "border search exception"—which recognizes that routine warrantless and suspicionless searches of individuals and their luggage at the nation's borders are reasonable for Fourth Amendment purposes—is applicable to searches of individuals arriving at the Virgin Islands internal customs border from the continental United States. *Id.* at *1. In light of the Third Circuit's holding in *United States v. Hyde*, 37 F.3d 116, 118 (3d Cir. 1994)—which established that routine warrantless and suspicionless searches of individuals departing from the Virgin Islands to the continental United States are reasonable under the Fourth Amendment—the Court concluded that routine warrantless and suspicionless searches at the internal customs border between the continental United States and the Virgin Islands may be reasonable for Fourth Amendment purposes if two conditions are met: "(1) the search[es are] federally authorized; and (2) the United States' interest in regulating the flow of persons and effects across the border outweighs the individual's reasonable expectation of privacy at the border." *Id.* at *9.

The Court further observed that—while federal law and regulations authorize the warrantless and suspicionless searches of passengers traveling from the Virgin Islands to the continental United States—there was "no evidence before the Court that the warrantless and suspicionless searches of individuals and their luggage arriving in the Virgin Islands on flights from the continental United States have been authorized by federal law or regulation." *Id.* at *12.

Absent such federal authorization, the Court concluded that the warrantless and suspicionless searches of individuals arriving in the Virgin Islands from the continental United States are unreasonable under the Fourth Amendment. *Id.*

Although it concluded that the border search exception does not apply to searches of individuals arriving in the Virgin Islands from the continental United States, the Court considered whether the good faith exception to the exclusionary rule should apply with respect to the suppression of the evidence recovered as a result of the searches at issue in *Barconey*. Relevant to this determination, the Court noted that "where law enforcement acts 'with a good faith belief in the lawfulness of their conduct that was objectively reasonable[,] . . . suppression [of evidence recovered as the result of an unlawful search] is unwarranted.'" *Id.* at *13 (quoting *United States v. Katzin*, 769 F.3d 163, 182 (3d Cir. 2014)). The Court further observed that, both prior to and following the Third Circuit's ruling in *Hyde*, "various courts [had] noted that the border search exception *was* applicable to searches of individuals and their belongings arriving in the Virgin Islands from the continental United States." *Id.* at *15 (emphasis added) (collecting cases). While the Court had "parted ways with these prior opinions based on its conclusion that warrantless and suspicionless searches of individuals and their luggage occurring at the internal customs border as they arrive in the Virgin Islands from the continental United States must be federally authorized to be reasonable under the Fourth Amendment," the Court found that "existing legal authority for 36 years"—including at the time the searches in *Barconey* were performed—had established that the border search exception *was* applicable to such searches. *Id.* Accordingly, the Court concluded that "a reasonably well trained officer would *not* have known, nor should have been expected to know, that the warrantless and suspicionless searches of luggage performed at the Henry E. Rohlsen airport from flights arriving in the Virgin Islands from the continental United States were

illegal" at the time the searches in *Barconey* were performed, and thus the good faith exception to the exclusionary rule should apply with respect to the suppression of the evidence recovered in *Barconey*. *Id.* at *16.

The searches of Defendant's luggage and cell phone in the instant case occurred on March 5, 2018—prior to the filing of the Court's January 8, 2019 Opinion in *Barconey*. Officer King, Officer Lopez, and Special Agent Holmes each testified as to their understanding at the time the searches occurred—based on their training and instructions—that the searches of Defendant's belongings were permissible pursuant to law enforcement's border search authority. This testimony suggests that—as was the case in *Barconey*—law enforcement acted with an objectively reasonable good faith belief that the searches were lawful at the time Defendant's belongings were searched. Defendant, however, advances two arguments in support of her contention that the evidence recovered as a result of the searches of her luggage and cell phone should nonetheless be suppressed.

First, Defendant argues that "the authority CBP relied on to conduct the 'border searches' in question restricted officers to perform[ing] routine searches for the limited purpose of exacting customs duties." (Dkt. No. 67 at 5). Defendant contends that the CPB officers unreasonably exceeded the scope of this authority here by conducting searches for the purpose of intercepting contraband. *Id.* Because the good faith exception to the exclusionary rule applies only where law enforcement officers act with an objectively reasonable good faith belief in the lawfulness of their conduct, Defendant argues that the good faith exception to the exclusionary rule should *not* apply to the suppression of the evidence recovered in this case. *Id.* at 5, 8-9. Second, Defendant contends that law enforcement "was required to obtain a warrant before searching the contents of [her] phone," such that the warrantless searches of Defendant's cell phone violated her right to be free

from unreasonable searches under the Fourth Amendment. *Id.* at 12. She therefore contends that any evidence recovered as a result of the searches must be suppressed. The Court addresses each of Defendant's arguments in turn.

### 1. Scope of Border Search Authority

In its *Barconey* Opinion, the Court specifically rejected the contention advanced by Defendant that the scope of law enforcement's authority to conduct searches at the Virgin Islands internal customs border as recognized in *Hyde* is restricted to searches conducted for purposes of exacting customs duties. As the Court explained in *Barconey*, the border search exception is rooted in the government's well-established "'authority to conduct routine searches and seizures at the border, without probable cause or a warrant,' for the purpose of levying duties *and intercepting contraband*[.]" *Id.* at *3 (emphasis added) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)).

> The Third Circuit in *Hyde* traced the origins of the border search exception to the "broad comprehensive powers [t]o regulate commerce with foreign Nations" granted to Congress by the U.S. Constitution. *Hyde*, 37 F.3d at 119 (internal citation and quotation marks omitted). Congress has exercised that authority "[s]ince the founding of our Republic" to "grant[ ] the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Id.* (quoting *Montoya de Hernandez*, 473 U.S. at 537).

*Id.* at *3 n.10. Accordingly, the Court noted that "[t]he border search exception as normally applied permits Customs officers to perform routine customs searches 'to regulate the collection of duties *and* to prevent the introduction of contraband[.]'" *Id.* at *16 n.35 (quoting *Montoya de Hernandez*, 473 U.S. at 537) (emphasis added). Thus, "*[n]otwithstanding* that the record evidence indicate[d] that the searches [in *Barconey*] were performed for the purpose of detecting contraband as opposed to imposing customs duties[,]" the Court determined that the good faith exception to

11

the exclusionary rule was applicable to the searches that occurred in that case. *Id.* (emphasis added).

The Court is not persuaded by Defendant's argument that the Third Circuit's opinion in *Hyde* stands for the proposition that the authority of CBP officers to perform warrantless and suspicionless searches of individuals departing the Virgin Islands for the continental United States is limited to searches performed for the purpose of exacting customs duties. (Dkt. No. 67 at 6-7). In support of her argument, Defendant points to the *Hyde* Court's recognition that Congress established the internal border between the Virgin Islands and the continental United States for "customs purposes" to aid in the collection of customs duties. *Id.* at 6 (citing *Hyde*, 37 F.3d at 121-23). Based on the acknowledgment in *Hyde* that the Virgin Islands border was created for customs purposes, Defendant concludes that the internal customs border exists "solely for collecting duties," and that any search conducted at the internal customs border "is limited to discovering items for customs." *Id.* at 6-7.

It is true that the *Hyde* Court recognized that Congress had established a border between the continental United States and the Virgin Islands "for customs purposes." *Hyde*, 37 F.3d at 121 ("[S]ince the acquisition of the Virgin Islands, Congress has consistently asserted its authority to impose a border between the Virgin Islands and the rest of the United States for customs purposes[.]") The *Hyde* Court also found, however, that "[r]outine warrantless border searches without probable cause would appear to be as essential to the accomplishment of the objects of that customs border as similar traditional searches have universally been recognized to be to the objectives of traditional customs systems at international borders." *Hyde*, 37 F.3d at 122. Nothing in the language employed in the *Hyde* opinion suggests that "border searches" at the Virgin Islands internal customs border must be more limited in scope than the "traditional searches" performed

at international borders.[12] To the contrary, the Third Circuit noted in *Hyde* that "Congress has specifically authorized customs inspections when travelers enter the United States from the Virgin Islands and other United States possessions *in the same manner* as if the traveler had come from a foreign country[.]" *Id.* at 121 (emphasis added). Further undermining Defendant's argument, the Court is not aware of—and Defendant has not identified—any district court decision addressing searches at the Virgin Islands internal customs border which suggest that searches at that border must be more limited in scope than traditional border searches. *Cf. United States v. Chabot*, 531 F. Supp. 1063 (D.V.I. 1982); *United States v. Herbert*, 886 F. Supp. 524 (D.V.I. 1995); *United States v. Mark*, 2007 WL 2669576 (D.V.I. Sept. 5, 2007); *David v. Gov't of Virgin Islands*, 2009 WL 1872678 (D.V.I. June 25, 2009); *United States v. Rivera*, 2014 WL 5395792 (D.V.I. Oct. 23, 2014).

In light of the foregoing, the Court finds that the application of the border search exception at the Virgin Islands internal customs border as recognized in *Hyde* permits law enforcement to conduct routine customs searches "to regulate the collection of duties *and* to prevent the introduction of contraband[.]" *Montoya de Hernandez*, 473 U.S. at 537 (emphasis added). Although the Court determined in *Barconey* that the border search exception does not apply to warrantless and suspicionless searches of passengers and their belongings as they arrive in the Virgin Islands from the continental United States, Officer King, Officer Lopez, and HSI Holmes each testified in this case that they understood based on their training and instructions at the time

---

[12] Indeed, the underlying facts of the *Hyde* case militate against such an interpretation of its holding. In *Hyde*, three defendants received pat-down searches from Customs officers at the airport in St. Thomas as they were leaving the Virgin Islands for Miami, Florida, resulting in the discovery of cocaine. *Hyde*, 37 F.3d at 117. There is no indication that the Customs officers in *Hyde* performed these pat-down searches for the purpose of exacting customs duties, as opposed to detecting contraband.

Defendant's luggage was searched that such searches were permissible pursuant to law enforcement's border search authority. This understanding by the law enforcement officers comported with the existing legal authority at the time Defendant's luggage was searched.[13] As such, the Court finds that the law enforcement officers "acted with a good faith belief in the lawfulness of their conduct that was objectively reasonable" when they searched Defendant's luggage. *Katzin*, 769 F.3d at 182.[14] Accordingly, the good faith exception to the exclusionary rule applies here, and Defendant's request for the suppression of the evidence recovered as a result of the search of her luggage will be denied.

### 2. Cell Phone Searches in the Border Context

Defendant points to the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), in support of her claim that her Fourth Amendment right to be free from unreasonable searches was violated when law enforcement searched her cell phone. In *Riley*, the Supreme Court considered whether law enforcement's search of an individual's cell phone absent a warrant may be justified under the "search incident to arrest" exception to the warrant requirement. *Riley*, 573

---

[13] As was true in *Barconey*, it was not until *after* the searches were conducted in the instant case that any legal authority casting doubt on the application of the border search exception to searches of persons and effects arriving in the Virgin Islands from the continental United States came into existence. *See United States v. Baxter*, 2018 WL 6173880, at *11-16 (D.V.I. Nov. 26, 2018). The *Baxter* case arose in a context involving packages inspected by CBP officers that arrived at the airport in St. Thomas by Priority Mail.

[14] To the extent Defendant argued at the suppression hearing that the good faith exception may apply only where law enforcement officers rely on binding appellate authority, the Court notes that it previously rejected an identical argument in *Barconey*. *See Barconey*, 2019 WL 137579 at *15. As the Third Circuit has explained, the "fundamental inquiry" in the determination of whether the good faith exception should apply is "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal under all of the circumstances," *United States v. Vasquez-Algarin*, 821 F.3d 467, 483 (3d Cir. 2016) (quotations and internal quotation marks omitted)—circumstances which here include legal authority, albeit at the district court level.

U.S. at 381. The Supreme Court considered the rationale underlying the search incident to arrest exception—officer safety and prevention of the destruction of evidence—along with the privacy interests implicated by searches of cell phones, which the Court recognized as devices that "contain[] a broad array of private information[.]" *Id.* at 383, 393-97. Balancing these interests, the Supreme Court concluded that a "warrant is generally required" before law enforcement may perform a search of an individual's cell phone, even where the cell phone is seized incident to arrest. *Id.* at 401.

As the Government notes, however, the *Riley* decision did not arise in the border context. Further, the Supreme Court specifically noted in *Riley* that "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 401-02. The Government therefore contends that— absent any authority restricting the ability of law enforcement to perform cell phone searches in the border context—law enforcement in this case justifiably relied on the "robust body of pre-*Riley* caselaw that allow[s] warrantless border searches of computers and cell phones" in conducting the searches of Defendant's cell phone here. (Dkt. No. 70 at 8 (quoting *United States v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018)).

The question before the Court is whether—in light of the Supreme Court's decision in *Riley*, which preceded the searches in this case—law enforcement nonetheless possessed an "objectively reasonable good faith belief" that the searches of Defendant's cell phone were permissible under the border search exception at the time they were performed, such that the good faith exception to the exclusionary rule should apply here. *Katzin*, 769 F.3d at 182.[15] In support of

---

[15] Although the parties' filings are somewhat unclear on this point, the Court's analysis necessarily proceeds under the good faith exception rubric, as the Court's January 8, 2019 Opinion in *Barconey* established that the underlying border search performed by law enforcement in this case

its argument that the good faith exception should apply, the Government points to various post-*Riley* decisions from the circuit courts for the proposition that the "border search exception still applies post-*Riley* to searches of electronic devices[.]" (Dkt. No. 70 at 9). The Government also notes that the Fourth, Fifth, and Seventh Circuits have all held—at a minimum—that the good faith exception is applicable to searches of electronic devices in the border context that were performed after *Riley* was decided. *Id.* at 8-9 (citing *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018); *United States v. Molina-Isidoro*, 884 F.3d 287 (5th Cir. 2018); *United States v. Wanjiku*, 919 F.3d 472 (7th Cir. 2019)).

The Court finds the Seventh Circuit's decision in *United States v. Wanjiku*, 919 F.3d 472 (7th Cir. 2019) to be particularly instructive. In that case, Donald Wanjiku was referred to a CBP secondary inspection area at O'Hare International Airport upon his arrival in Chicago from a trip to the Philippines. *Id.* at 474-75. Wanjiku was selected for referral to the secondary inspection area as part of a law enforcement operation targeting child sex trafficking because he fit certain criteria—namely, that he was "a U.S. citizen male, then aged forty-one, returning from the Philippines, traveling without any apparent companion, with a prior arrest." *Id.* at 474.

After obtaining a binding declaration from Wanjiku and inspecting his luggage, a CBP officer asked Wanjiku to unlock his password-protected cell phone. *Id.* at 476-77. Although Wanjiku resisted the request at first, he "relented when [the CBP officer] told him that everything was searchable at the border and that the phone would be seized, unlocked by a 'lab,' and examined whether or not Wanjiku unlocked it." *Id.* at 477. After Wanjiku unlocked the phone, the CBP

---

as Defendant arrived in the Virgin Islands from the continental United States was constitutionally impermissible. The question, therefore, is whether, at the time the searches of Defendant's cell phone occurred, law enforcement had an objectively reasonable good faith belief that the searches of Defendant's cell phone were permissible under then-existing legal authority.

officer took the phone and "manually scrolled through the pictures." *Id.* The CBP officer then turned the phone over to HSI in order that an HSI forensics team could search the phone in an attempt to identify any child pornography. *Id.* While Wanjiku was in the secondary inspection area, HSI agents used forensic software to "preview" the contents of Wanjiku's cell phone and a hard drive that was discovered in his luggage. These searches resulted in the discovery of child pornography. *Id.* at 477-78. HSI agents seized a laptop from Wanjiku after discovering the child pornography on the cell phone and hard drive. The laptop was taken to an HSI lab, where it was searched approximately one week later using forensic software. *Id.* at 478.

Wanjiku filed a motion to suppress the evidence discovered as a result of the searches of his electronic devices, which was denied by the district court. On appeal, Wanjiku argued that, in light of the Supreme Court's decision in *Riley*, "border searches of electronic devices may be conducted only with a warrant supported by probable cause." *Id.* at 479. Alternatively, Wanjiku argued that "if the applicable standard [at the border] is reasonable suspicion," the information known to law enforcement at the time the searches occurred was insufficient to give rise to reasonable suspicion to believe that a crime was being committed. *Id.* The government argued that "no individualized suspicion is needed for a routine border search of electronic devices," but that if the court were to find that *Riley* established a probable cause requirement for searches of electronic devices at the border, the good faith exception should apply. *Id.* Alternatively, the government maintained that—in the event the applicable standard was reasonable suspicion—that standard was met under the circumstances. *Id.*

Avoiding the "thorny issue of the appropriate level of suspicion required" to support the searches of Wanjiku's electronic devices, the Seventh Circuit resolved Wanjiku's appeal through an analysis of the application of the good faith exception. *Id.* Specifically, the Seventh Circuit

affirmed the district court's denial of Wanjiku's motion to suppress because law enforcement "acted in good faith when they searched [his] devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border." *Id.*

In reaching the conclusion that the good faith exception was applicable under the circumstances, the *Wanjiku* Court observed—based on its review of border search authority—that "[t]he highest standard that has been applied by the Supreme Court [to any search] at the border is reasonable suspicion." *Id.* at 481 (citing *Montoya de Hernandez*, 473 U.S. at 541). Although the Seventh Circuit had yet to address the precise issue presented by the facts of *Wanjiku*—the standard applicable to a "non-destructive search of the contents of electronic devices at the border"—the *Wanjiku* Court noted that in previous cases involving border searches characterized as "arguably non-routine," the Seventh Circuit had applied the reasonable suspicion standard. *Id.* at 482.[16]

While recognizing that the Supreme Court's decisions in *Riley* and *Carpenter v. United States*, 138 S. Ct. 2206 (2018), supported Wanjiku's "general argument that the Supreme Court has recently granted heightened protection to cell phone data," the Seventh Circuit noted that

---

[16] The Third Circuit has similarly recognized a distinction between routine border searches—which "may be conducted, not just without a warrant, but without probable cause, reasonable suspicion, or any suspicion of wrongdoing," *United States v. Whitted*, 541 F.3d 480, 485 (3d Cir. 2008) (citations omitted)—and non-routine searches, which "require reasonable suspicion of wrongdoing to pass constitutional muster." *Id.*

Notably, a Third Circuit panel decision in a pre-*Riley* case suggests that the search of electronic devices may be characterized as a routine border search. In *United States v. Linarez-Delgado*, 259 F. App'x 506 (3d Cir. 2007), a Third Circuit panel—observing that "Customs Officers exercise broad authority to conduct routine searches and seizures for which the Fourth Amendment does not require a warrant, consent, or reasonable suspicion"—held that "[d]ata storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search." *Id.* at 508 (citations omitted).

neither Supreme Court case addressed "searches at the border where the government's interests are at their zenith[.]"[17] *Id.* at 485. The *Wanjiku* Court continued:

> Prior to *Riley*, the [Supreme] Court required nothing more than reasonable suspicion for a highly intrusive border search and seizure wherein a woman was held at the airport for sixteen hours in order for authorities to monitor her next bowel movement. *Montoya de Hernandez*, 473 U.S. at 541, 105 S.Ct. 3304. For non-destructive searches of property at the border, the Court required no particularized suspicion at all. *Flores-Montano*, 541 U.S. at 155-56, 124 S.Ct. 1582.

*Id.* at 485. The *Wanjiku* Court further found that "no circuit court, before or after *Riley*, has required more than reasonable suspicion for a border search of cell phones or electronically-stored data." *Id.* (citing *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018); *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018); *United States v. Vergara*, 884 F.3d 1309 (11th Cir. 2018); *United States v. Molina-Isidoro*, 884 F.3d 287 (5th Cir. 2018); *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013)).

In sum, the *Wanjiku* Court determined that, at the time the searches of Wanjiku's devices occurred, "the Supreme Court required no particularized suspicion for a non-destructive border search of property, and, at most, reasonable suspicion for a highly intrusive border search of a person's most intimate body parts." *Id.* Therefore, "[g]iven the state of the law at the time of these searches of the contents of Wanjiku's electronic devices," the *Wanjiku* Court found that "the agents [] possessed an objectively good faith belief that their conduct did not violate the Fourth Amendment because they had reasonable suspicion to conduct the searches." *Id.* at 485-86.

Under the facts of the instant case, the Court similarly concludes that law enforcement had an objectively reasonable good faith belief that the searches of Defendant's cell phone were

---

[17] In *Carpenter*, the Supreme Court held that the government "must generally obtain a warrant supported by probable cause" before acquiring cell-site location information for a particular cell phone from a wireless carrier. *Carpenter*, 138 S. Ct. at 2221.

permissible under the legal authority existing at the time they were conducted. Testimony at the suppression hearing established that Special Agent Holmes requested Defendant's consent to view the contents of her cell phone at some point after CBP officers had discovered packages containing suspected marijuana and cash in Defendant's luggage. Defendant provided consent.[18] Special Agent Holmes and other law enforcement officers manually reviewed the contents of Defendant's cell phone while at the airport. Law enforcement retained Defendant's cell phone and conducted a forensic search of its contents approximately one month later.

Thus, at the point when Special Agent Holmes first requested Defendant's consent to review the contents of her cell phone, law enforcement officers had already discovered the suspected marijuana and cash in Defendant's luggage. As such, the Court concludes that—as of the time Defendant's cell phone was manually searched and continuing through the time that her cell phone was forensically searched approximately one month later—law enforcement officers had not only reasonable suspicion, but probable cause to believe that Defendant was involved in criminal activity. *See, e.g., United States v. Hudson*, 346 F. App'x 903, 905 (3d Cir. 2009) (officers' observation of "multiple marked plastic baggies containing a white chunky substance" established "probable cause to believe that the baggies contained illegal drugs, and that [the defendant] was involved in criminal activity"). As was the case in *Wanjiku*, "no circuit court . . . ha[d] required more than reasonable suspicion for a border search of cell phones or electronically-stored data" at the time the searches of Defendant's cell phone occurred. *Wanjiku*, 919 F.3d at 475; *see also Molina-Isidoro*, 884 F.3d at 293 ("The bottom line is that only two of the many federal cases addressing border searches of electronic devices have ever required *any* level of suspicion.")

---

[18] The Court has not considered whether the cell phone searches were alternatively justified by Defendant's provision of consent because the Government did not raise this argument in its filings.

(emphasis added).[19] Accordingly, given the state of the law at the time the searches of Defendant's cell phone occurred, the Court finds that the law enforcement officers in this case acted with an "objectively reasonable good faith belief in the legality of their conduct" when they searched Defendant's cell phone because there was probable cause to believe that Defendant was involved in criminal activity. *Katzin*, 769 F.3d at 182.

Defendant does not distinguish in her filings between law enforcement's manual search of her cell phone at the airport and the forensic search of her cell phone approximately one month later. Any such argument by Defendant would not, however, alter the Court's conclusion that the good faith exception is applicable here. *See United States v. Kolsuz*, 890 F.3d 133, 136-37 (4th Cir. 2018) (holding in a border search case that—"[d]espite the temporal and spatial distance between the off-site analysis of the [defendant's] phone and [his] attempted departure at the airport"—a forensic search of the defendant's phone was "properly categorized as a border search" where "agents took possession of his smartphone and subjected it to a month-long, off-site forensic analysis, yielding a nearly 900-page report cataloguing the phone's data"). In *Kolsuz*, the Fourth Circuit further concluded that, under the circumstances, "it was reasonable for the CBP officers who conducted the forensic analysis of [the defendant's] phone to rely on the established and uniform body of precedent allowing warrantless border searches of digital devices that are based on at least reasonable suspicion." *Id.* at 148 (citation omitted). The same holds true here with respect to law enforcement's forensic search of Defendant's cell phone approximately one month after the events at the Henry E. Rohlsen airport.

---

[19] The Court is aware of no federal authority in the wake of the Seventh Circuit's ruling in *Wanjiku* suggesting that anything more than reasonable suspicion is required to justify the search of a cell phone in the border context, and Defendant has pointed to none.

Similarly, the fact that Defendant was seized at the time the searches of her cell phone occurred does not alter the Court's conclusion with respect to the application of the good faith exception. *See Kolsuz*, 890 F.3d at 142-43 (holding that the fact of a defendant's arrest during a border search did *not* "transform the [subsequent] examination of his phone into a search incident to arrest, triggering *Riley* and calling for a search warrant based on probable cause"). Defendant has pointed to no caselaw establishing that law enforcement's authority to perform searches of electronic devices pursuant to the border search exception is limited post-*Riley* by the fact of a defendant's arrest. Absent any such caselaw, the Court finds that, in performing the searches of Defendant's cell phone, it was reasonable for the law enforcement officers in this case "to continue to rely on the robust body of pre-*Riley* caselaw that allowed warrantless border searches of computers and cell phones." *Molina-Isidoro*, 884 F.3d at 292.

Accordingly, the Court finds that the good faith exception applies here, and Defendant's request for the suppression of the evidence recovered as a result of the searches of her cell phone will be denied.

**B.   Defendant's Statements to Law Enforcement**

As discussed above, Defendant requests the suppression of the initial statements she made to Officer Lopez and the statements she subsequently made to Special Agents Holmes and Adeen. After reviewing the applicable legal principles, the Court addresses each request in turn.

**1.   Applicable Legal Principles**

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST., amend. V. In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). *Miranda*'s holding is based on a recognition "that interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *New York v. Quarles*, 467 U.S. 649, 654 (1984). *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). "[T]he presence of both a custodial setting and official interrogation is required to trigger *Miranda* warnings, therefore, in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 395 (D.V.I. 1997); *see also Alston*, 34 F.3d at 1244 (same).

A suspect is "in custody" when "'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (internal citation and quotation marks omitted). "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe)" in which courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting

*Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (internal quotations omitted) (emphasis removed)). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v. Killingsworth,* 118 F. App'x. 649, 650 (3d Cir. 2004) (citing *Stansbury v. California,* 511 U.S. 318, 325 (1994)).

The second prong of the *Miranda* analysis requires that the defendant be interrogated by the Government. An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

In *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006), the Third Circuit examined at length the application of *Miranda* rules in the context of immigration inspections at international borders, holding that "normal *Miranda* rules simply cannot apply to this unique situation at the border." *Id.* at 529 (citing *United States v. Gupta*, 183 F.3d 615, 617-18 (7th Cir. 1999)); *see also United States v. St. Vallier*, 404 F. App'x 651, 656 (3d Cir. 2010) ("[N]ormal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States.") (citing *Kiam*, 432 F.3d at 529-30). Immigration and Customs officers have a responsibility to inspect entrants at our borders, and "[s]uspicion of criminal conduct cannot overrule [that] simultaneous responsibility . . . ." *Kiam*, 432 F.3d at 531 (citing *United States v. Silva*, 715 F.2d 43, 48 (2d Cir. 1983) (holding that Customs officers were "duty-bound to determine whether Silva was entitled to enter the country with her effects" regardless of their suspicion of criminal conduct, and *Miranda* warnings were not required)). Further, an individual seeking to enter the United States "does *not* have a right to remain silent." *Kiam*, 432 F.3d at 529 (quoting *Gupta*, 183 F.3d at 617). As such, individuals seeking to enter the United States may be

questioned without *Miranda* warnings even if subject to custody and may be "taken out of a primary inspection line for secondary questioning . . . ." *Kiam*, 432 F.3d at 529-30. While *Kiam* specifically addressed immigration screening at international borders, a Third Circuit panel later relied on *Kiam* to apply its holding to the Customs inspection context. *St. Vallier*, 404 F. App'x at 656 n.4. ("[W]e find no material distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country.") (citing *Kiam*, 432 F.3d at 531; *Silva*, 715 F.2d at 48).

The Third Circuit has recognized, however, that even in the border context, "eventually, a 'line must be drawn,' beyond which *Miranda* warnings are required." *Kiam*, 432 F.3d at 530 (quoting *Gupta*, 183 F.3d at 618). Where an "inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution . . . this line has been crossed." *Id.* The line is not crossed, however, where there is "mere overlap" between questions geared towards an assessment of the admissibility of an individual or his effects and questions bearing on a potential criminal prosecution. *Id.* at 530 n.6; *see also St. Vallier*, 404 F. App'x at 657 (noting "the practical reality that determinations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity"). While "an [individual's] admission of criminal conduct or discovery of drugs might represent a transition point after which questioning could only practically relate to a potential criminal prosecution," the fundamental inquiry is whether a customs official's questions "bear upon both admissibility and criminal conduct, while not relating solely to the prosecution of the latter . . . ." *St. Vallier*, 404 F. App'x at 657-58 (citing *Kiam*, 432 F.3d at 531). If so, the questions are permissible and the answers admissible, because they do not cross the boundary articulated by the Third Circuit in *Kiam*.

## 2. Defendant's Statements to Officer Lopez

Defendant requests the suppression of the statements she made to Officer Lopez prior to Officer Lopez's initial search of Defendant's luggage on the ground that Officer Lopez's questioning violated *Miranda*. The Government contends that Officer Lopez was not required to provide *Miranda* warnings before questioning Defendant because Defendant was not in custody at the time of the questioning. Alternatively, the Government asserts that—even if Defendant was in custody at the time of Officer Lopez's questioning—Defendant's *Miranda* rights were not violated because CPB officers are permitted to ask routine questions at the border without providing *Miranda* warnings.

In her Motion to Suppress, Defendant states that she was interrogated by CPB officers *after* she was handcuffed and escorted to the secondary inspection area. (Dkt. No. 17 at 2, 5). This recitation of events does not align with the record that emerged during the suppression hearing, wherein Officer Lopez testified that she asked Defendant three questions while in a public area of the airport prior to searching Defendant's luggage and before Defendant was handcuffed. Officer Lopez further testified that there was "basically no conversation" between the CBP officers and Defendant after Defendant was handcuffed and escorted to the secondary inspection area. Thus, the evidence of record does not suggest—nor does Defendant argue—that Defendant was in custody at the time when Officer Lopez testified that she questioned Defendant, and no *Miranda* warnings were therefore required.

Even assuming that Defendant was in custody when she was questioned by Officer Lopez, the Court concludes that Officer Lopez was not required to provide *Miranda* warnings before

questioning Defendant.[20] Officer Lopez testified that she asked Defendant three questions prior to searching Defendant's luggage to obtain what she referred to as an "oral binding declaration." First, Officer Lopez asked: "Are these your bags?" Defendant replied affirmatively. Second, Officer Lopez asked whether Defendant had packed the bags herself. Defendant stated that she had, with the exception of the carry-on suitcase, which her cousin had packed. Third, Officer Lopez asked whether there was anything in the bags that could puncture or cut Officer Lopez. Defendant stated that there was not.

*Kiam* and *St. Vallier* are instructive. Officer Lopez posed her questions to Defendant in what she reasonably believed to be a unique border context where "normal *Miranda* rules simply cannot apply . . . ." *Kiam*, 432 F.3d at 529. The determinative question thus becomes whether Officer Lopez "crossed the line" established by the Third Circuit in *Kiam* when she questioned Defendant about her luggage without providing *Miranda* warnings. If Officer Lopez's questions "objectively cease[d] to have a bearing on the grounds for admissibility and instead only further[ed] a potential criminal prosecution," the questions crossed the line, and *Miranda* warnings were required. *Id.* at 530; *see also United States v. Molina-Gomez*, 781 F.3d 13, 24 (1st Cir. 2015) (finding that *Miranda* warnings were required where CBP officers asked a defendant questions about his involvement with drug activity that "had nothing to do with whether or not to admit [the defendant] into the country."). But if there was simply an overlap between questions relevant to

---

[20] The Court's determination above that law enforcement held an objectively reasonable good faith belief in the applicability of the border search exception to the events of this case applies in like fashion to the Court's analysis here. Accordingly, the Court will consider the questions that Officer Lopez posed to Defendant in light of her objectively reasonable good faith belief that her authority to ask questions regarding the admissibility of persons and their effects as they arrived at the internal customs border from the continental United States was identical to the authority she possessed to pose such questions to individuals departing the Virgin Islands for the continental United States.

Officer Lopez's customs duties and questions relevant to possible criminal conduct, the questions did not cross the line, and no *Miranda* warnings were required. *Kiam*, 432 F.3d at 530 n.6; *St. Vallier*, 404 F. App'x at 657.

Given CBP canine officer Cougar's passive indication on Defendant prior to Officer Lopez's questioning, Officer Lopez had reason to suspect Defendant's involvement in criminal activity before she questioned Defendant. But this fact is not dispositive. The Third Circuit has made clear that a "mere overlap" between questions relating to admissibility of persons or effects and questions relating to criminal activity does not trigger the need for *Miranda* warnings. *Kiam*, 432 F.3d at 530 n.6; *St. Vallier*, 404 F. App'x at 657. Indeed, the Third Circuit has specifically *refused* to hold that "if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the [individual] before questioning him on any subject." *Kiam*, 432 F.3d at 530. As explained in *St. Vallier*:

> [D]eterminations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity. A criminal offense, such as illegal reentry, may be inextricably tied to a person's admissibility, yet customs officers are not required to provide Miranda warnings prior to asking questions that might bear upon this illegal conduct. The same is true when an officer may suspect that an individual or that individual's effects must be interdicted because of a presently occurring effort or ongoing conspiracy to smuggle drugs across the international border. Accordingly, suspicion of criminal conduct does not overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders. Similarly, questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*.

*Id.* at 657 (citations and internal quotations omitted). Further, the test outlined in *Kiam* and *St. Vallier* calls for an *objective* inquiry into whether a CBP officer's questions ceased to have a bearing on the officer's customs duties, rather than an inquiry into the subjective intent of the officer in questioning an individual. *See United States v. Harder*, 180 F. Supp. 3d 355, 365 (E.D. Pa. 2016) (finding that regardless of customs agents' "subjective intent, their questions certainly

had a bearing on Defendant's admissibility and did not '*only* further a potential criminal prosecution'") (quoting *Kiam*, 432 F.3d at 530).

The Court finds that the three questions posed to Defendant by Officer Lopez were basic and typical of the questions that CBP officers ask at the border as part of the exercise of their authority to determine the admissibility of persons and effects. Officer Lopez's questions addressed Defendant's ownership of the luggage, her awareness of its contents, and whether anything in the luggage could harm Officer Lopez during a search. Although Officer Lopez's questions elicited responses that could aid law enforcement in its criminal prosecution of Defendant—specifically, Defendant's admission to ownership of bags containing suspected contraband—basic questions about an individual's ownership of luggage are fundamental to CBP officers' inspection duties at a customs border.

In short, because the routine customs questions asked by Officer Lopez were objectively relevant to her customs inspection, she was not required to provide Defendant with *Miranda* warnings before questioning her. Defendant's arguments to the contrary are rejected and her statements to Officer Lopez will not be suppressed.

### 3. Defendant's Statements to Special Agents Holmes and Adeen

Defendant advances two arguments in support of her contention that her statements to Special Agents Holmes and Adeen during their interview of Defendant should be suppressed. First, Defendant claims that her statements must be suppressed because they are the "fruits of an unlawful detention and arrest[.]" (Dkt. No. 17 at 5). Second, Defendant contends that her statements must be suppressed because they were given involuntarily. *Id.*

Defendant's claim that her detention and arrest were unlawful is tied to her argument that the good faith exception should not apply to law enforcement's search of Defendant's luggage

pursuant to the border search exception. Because the Court has determined that the law enforcement officers held an objectively reasonable good faith belief in the applicability of the border search exception to the events of this case, Defendant's arrest following the discovery of alleged marijuana and cash in her luggage by CBP officers was not unlawful. Accordingly, Defendant's request for the suppression of her statements to Special Agents Holmes and Adeen on the ground that her statements were the product of an unlawful detention and arrest will be denied.

With respect to Defendant's argument that the statements she made during her interview with Special Agents Holmes and Adeen were given involuntarily, the record established during the suppression hearing demonstrates that, following the discovery of alleged marijuana and cash in Defendant's luggage, Defendant was interviewed by the Special Agents in a room in the airport that serves as a cafeteria or lounge area for CBP officers. Defendant was not restrained as she was brought into the interview room, nor was she restrained during the interview. Prior to commencing the interview, Special Agent Holmes read Defendant her *Miranda* rights and presented Defendant with a Statement of Rights/*Miranda* Waiver form. Defendant signed the waiver portion of the form, which includes an acknowledgment that Defendant's rights had been explained to her; that Defendant fully understood those rights; and that Defendant was waiving her rights "freely and voluntarily, without threat or intimidation and without any promise of reward or immunity." (Evid. Hr'g Gov't Ex. 4).

The Government does not contest that Defendant was in custody and subject to an interrogation for purposes of *Miranda* when she was interviewed by Special Agents Holmes and Adeen. It maintains, however, that the totality of the circumstances here demonstrate that Defendant waived her *Miranda* rights and voluntarily gave statements to the Special Agents. (Dkt. No. 22 at 10-11).

"It is well-settled that a defendant can waive his or her *Miranda* rights if the waiver is made knowingly, intelligently and voluntarily." *United States v. Kabiarets*, 496 F. Supp. 2d 394, 401 (D. Del. 2007) (citation omitted). Two factors affect the determination of whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421 (1986) (internal quotation and quotation marks omitted).[21]

In analyzing the totality of the circumstances, courts should consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd*, 234 F.3d 1266 (3d Cir. 2000) (citation omitted).

Neither Defendant's Motion nor her supplemental filing identify any evidence in the record suggesting that Defendant's decision to waive her *Miranda* rights was the product of intimidation, coercion, or deception. Defendant's filings are also devoid of any indication that Defendant was unaware of the nature of her *Miranda* rights or of the consequences of her decision to abandon them. The record evidence demonstrates that Defendant was not physically restrained during the interview with Special Agents Holmes or Adeen, nor was Defendant otherwise subject to

---

[21] The Constitution does not require, however, "that a suspect know and understand every possible consequence of the waiver of his *Miranda* rights." *Kabiarets*, 496 F. Supp. 2d at 401 (citing *Colorado v. Spring,* 479 U.S. 564, 574 (1987)). "Rather, a defendant must be informed of the 'pertinent consequence' that the Government will use the information provided by him in order to secure a conviction." *Id.* (quoting *Miranda,* 384 U.S. at 469).

conditions that suggest intimidation, coercion, or deception on the part of the Special Agents.[22] Further, the record indicates that the Special Agents read Defendant her *Miranda* rights; that Defendant understood those rights; and that Defendant knowingly, voluntarily, and intelligently waived her rights, as reflected by her decision to sign the Statement of Rights/*Miranda* Waiver form. There is no evidence in the record relating to Defendant's background, experience, or conduct during the interview which suggests that Defendant's waiver of her *Miranda* rights was involuntary.

In sum, the Court finds that the totality of the circumstances here demonstrate that Defendant knowingly, voluntarily, and intelligently waived her *Miranda* rights and voluntarily provided statements to Special Agents Holmes and Adeen. Accordingly, Defendant's request for the suppression of her statements to Special Agents Holmes and Adeen on the ground that her statements were given involuntarily will be denied.

### III.    CONCLUSION

For the reasons discussed above, the Court will deny Defendant's Motion to Suppress in its entirety. An appropriate Order accompanies this Memorandum Opinion.

Date:   June 3, 2019

_____/s/_____
WILMA A. LEWIS
Chief Judge

---

[22] To the contrary, Special Agent Holmes' testimony indicates that she took steps to ensure that Defendant was comfortable by offering Defendant water and asking if she needed access to her medication.